UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH WILLIAM FAUST,

                        Plaintiff,                Case No.: 12-cv-10412
                                                  Honorable Victoria A. Roberts
              v.                    Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 15]**

      Plaintiff Joseph Faust brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

      For the reasons set forth below, the court finds that the ALJ's determination that Faust is not disabled is supported by substantial evidence of record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Faust's motion [11] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On May 12, 2010, Faust filed applications for DIB and SSI, alleging disability as of December 15, 2007. (Tr. 104-109). The claims were denied initially on August 18, 2010. (Tr. 65-72). Thereafter, Faust filed a timely request for an administrative hearing, which was held on June 14, 2011, before ALJ Kathleen Eiler. (Tr. 31-62). Faust, represented by attorney Michael Hall, testified, as did vocational expert ("VE") Anne Trimley. (*Id.*). On August 9, 2011, the ALJ found Faust not disabled. (Tr. 8-24). On December 14, 2011, the Appeals Council denied review. (Tr. 1-4). Faust filed for judicial review of the final decision on January 31, 2012 [1].

### B.    Background

#### 1.    Disability Reports

In a May 12, 2010 disability report, Faust reported that the condition limiting his ability to work is bipolar disorder. (Tr. 132). He reported currently working as a part-time retail sales clerk at a hobby shop. (Tr. 134). He was being seen by two doctors for his condition, and had been prescribed Abilify and Depakote. (Tr. 135-37).

In a May 27, 2010 function report, Faust reported living with family, and that his daily activities vary "from day to day," but include "forc[ing]" himself out of bed, dressing, taking medication, then "hybernat[ing]" in his room or at the computer until he is "forced to go to work." (Tr. 140). After he leaves work, Faust reported lying in bed "until someone forces me to move again." (*Id.*). He reported caring for his dog with the occasional help of his mother. (*Id.*). He also reported that his conditions affect his sleep, causing him to sometimes go days with "little to no sleep." (*Id.*). He reported difficulty with personal care, including frequent failure to bathe, change clothes, comb hair, or shave, and refusal to eat. (*Id.*). He needs reminders to do

these things, as well as to take his medication. (Tr. 141). He reported not cooking, and that he would likely not eat unless someone cooked him meals and served him. (*Id.*).

Faust reported performing some chores, including mowing the lawn, taking out the trash and cleaning his room. (*Id.*). However, he reported needing "constant" reminders and that sometimes these chores could take him days to complete due to distractions. (*Id.*). He reported going out "as little as possible" due to a fear of being in public. (Tr. 142). He also reported that his license had been suspended due to distracted driving. (*Id.*). His mother handles his money because he has trouble with money management – he only shops once a week with the money his mother gives him, and he reported that "[i]t usually only takes a few moments before my money is gone." (*Id.*). His hobbies include painting, guitar, writing, reading, and playing a trading card game. (Tr. 143). He partakes in these activities generally weekly, although their frequency has declined because he is "often too depressed to do anything." (*Id.*). He also has friends who come visit him weekly, and he works 15-20 hours a week. (*Id.*).

Faust reported "fits of rage and violent outbursts toward friends and family[;] so severe on occasion that police have had to be called." (Tr. 144). He no longer participates in social activities due to fear of being in public. (*Id.*). He reported that his conditions affect his ability to talk, complete tasks, concentrate, remember, understand, follow instructions and get along with others. (*Id.*). He has "unsettling thoughts and fears that interfere with my communication skills, making it hard to take and follow through with instructions." (*Id.*). His ability to pay attention is "mood dependent," and he reported "often los[ing] my train of thought mid-sentence, making reading difficult at times," as well as having difficulty listing to others. (*Id.*). Faust reported that "authority figures tend to become targets" of his aggression, and that stress causes him "to shake, and the shaking feeds into my paranoia, which fuels my stress." (Tr. 145). He reported being

3

afraid of other people's thoughts "and the things they may say or do to me." (*Id.*). Faust reported that the side effects of his medications included weight gain and drowsiness. (Tr. 146).

In a supplemental statement, Faust reported having depressive episodes that make it difficult for him to get out of bed or leave the house, and manic episodes that he often does not recognize occurring until he takes some sort of action, like stealing a soda from the store despite having money. (Tr. 147). He reported paranoia that causes him to shake at work when dealing with customers, and a need to take "an inordinate number of breaks from my job . . . in order to relieve myself of the stress that I deal with." (*Id.*). He also reported violent outbursts that "would undoubtedly cause me termination from my place of employment." (*Id.*). However, he reported that he is "fortunate enough to have a lenient employer" who does not "require me to work more than a few hours at a time, except on rare occasions." (*Id.*). He also reported not having these outbursts at work. (*Id.*). He reported that he did not believe he could work at a more stressful job or more hours than he currently works due to his conditions. (*Id.*).

In a third-party function report, Faust's mother reported that he lives with her and that the two "spend almost all of the time together." (Tr. 156). She reported that he has difficulty sleeping most of the time, but at other times it is hard to get him out of bed. (Tr. 157). She also reported that he needs constant reminders to bathe and take his medication and that he often does not remember whether or not he took it. (Tr. 158). She reported that Faust does clean his room and make his bed and that he sometimes mows the lawn but must be constantly supervised because he gets distracted. (*Id.*). She reported that Faust works about four days a week, but must be driven due to a restricted license. (Tr. 159). He comes home from work "a frantic mess, shaking sometimes profusely." (Tr. 164). She reported of times when he told her he has hid in the backroom or bathroom at work for fear of losing control. (*Id.*). She also reported that the

4

employer is very lenient with her son, even when he makes costly mistakes at work due to his condition. (*Id.*). Faust avoids shopping and is unable to manage his own money. (Tr. 159). His mother reported that his only current hobbies were card games and the internet and that he sometimes plays cards with friends but usually comes home early. (Tr. 160).

Faust's mother reported that his conditions affect his memory and concentration, his ability to complete tasks, understand or follow instructions, and to get along with others. (Tr. 161). She reported that his memory is very poor, that he has a hard time completing tasks due to distractions, and that even with written instructions he often fails to progress beyond one or two steps before she finds him "sitting somewhere not remembering what he was even doing." (Tr. 165). She reported that his paranoia and tremors forced him to quit high school and obtain a GED instead. (Tr. 162). She reported that he does not cope well with change and that he has drastic mood swings and violent outbreaks. (*Id.*).

In a December 15, 2010 disability appeals report, Faust reported that his tremors, memory problems, concentration and paranoia had all worsened. (Tr. 192). He also reported increased panic attacks, "psychomotor agitation" and "flight of ideas." (*Id.*). He reported seizures that were the effect of one of his medications. (*Id.*). In a medications form completed on June 14, 2011, Faust reported taking Depakote and Klonopin for his condition. (Tr. 213).

### 2.    *Plaintiff's Testimony*

At the hearing before he ALJ, Faust testified that he was 20 years old and had completed the 11th grade, and then got his GED. (Tr. 35). He testified that he was diagnosed as bipolar and that he has both depressive and manic spells. (Tr. 55). On days he is depressed, it is hard for him to get out of bed, and he will usually not eat much, causing him to quickly lose a large amount of weight. (Tr. 55-56). On manic days, he has a hard time controlling himself and tends

5

to make impulsive decisions. (Tr. 57). He rarely finishes projects because his mind is racing. (*Id.*). He also experiences insomnia when he is manic. (Tr. 57-58).

Faust testified that he works approximately 15-20 hours a week as a sales clerk at a small hobby shop. (Tr. 35). On a given day there may be as many as 15 customers in the store at one time. (Tr. 36). Faust testified he usually works three or four hours at a time and sometimes up to six hours on a Saturday. (Tr. 37-38). He does not feel like he could work more due to the stress he feels when dealing with others, particularly customers. (Tr. 36, 50-51). He testified that he has some shaking spells every day, and "full blown panic attack[s]" two to three times a week. (Tr. 52). On a busy Saturday, for example, he may take as many as five unscheduled breaks to go to the store's backroom and deal with his panic attacks and shaking spells. (Tr. 38). These breaks can be for as long as 15 minutes each. (Tr. 39). Faust testified to an instance where he had thoughts about torturing a particular customer, though he acknowledged "that's a horrible and disgusting thing to be thinking about while you're trying to deal with" the customer. (Tr. 48-49). He testified that he has paranoid thoughts that others are looking at him, talking about him or thinking about him negatively. (*Id.*). He testified that his employers are aware of his condition, and are very lenient with him. (*Id.*). When they notice him having trouble with a customer, they will relieve him so he can take a break. (Tr. 47; 50-51). He testified that in addition to having trouble interacting with others, he has difficulty with other tasks, such as stocking shelves and repairing models, because he finds it difficult to stay focused. (Tr. 39). This has led to occasional oversights on his part resulting in lost money for the store. (Tr. 39; 53-54).

Faust testified that he is currently on Depakote and Klonopin for his condition, and that the Depakote makes him feel drowsy and groggy. (Tr. 40). He testified to attending one

counseling session, and said that the clinic's scheduling made it difficult for him to attend other sessions. (Tr. 40-41). He occasionally helps out around the house, including cleaning his room and doing yard work, but he rarely cooks and does not shop because he does not go out in public unless necessary. (Tr. 41). He used to enjoy painting and playing the guitar, but testified that after being prescribed medication for his condition he has lost all interest in creative things. (*Id.*). He testified that he had once been considered a talented artist, and had planned to go to art school after high school, but his medication has sapped his creativity and he now rarely has any desire to paint. (Tr. 45-47). When he does paint, he loses focus and does not remember what he was intending to paint in the first place. (Tr. 46-47). He testified that he does play a trading card game and occasionally goes to tournaments, but if it is a big tournament where he does not know all the players, he will leave early. (Tr. 42). He testified that he does enjoy playing on the computer because there he does not have to deal with others. (*Id.*).

Faust testified that he had wanted to go to college but does not feel he could handle it at this time – even an online course – due to his medication dosage not being correct. (Tr. 43). He testified that he was recently hospitalized for suicidal ideation, but was discharged after telling people there he no longer had a desire to hurt others despite the fact that he actually still had that desire. (Tr. 43-44).

### 3.      *Medical Evidence*

#### a.      *Treating Sources*

##### i.      *Primary Care Physician*

Faust was seen by his primary physician on December 1, 2008. (Tr. 221). At that time, he reported recurrent, almost-daily headaches. (*Id.*). He had previously suffered from less frequent but more severe headaches, but the frequency had recently increased as the severity had

decreased.  (*Id.*).  He had recently seen a psychiatrist that had prescribed Prozac and Depakote, but the diagnosis was unclear at the time.  (*Id.*).  Faust's mother was not happy that an MRI had not been done to rule out other possible causes of the headaches.  (*Id.*).  Faust denied any inclination or attempts to hurt himself or others.  (*Id.*).  He was diagnosed with intractable headaches and an MRI was ordered.  (*Id.*).  He was also diagnosed with depression and the medication prescribed by the psychiatrist was continued.  (*Id.*).  An MRI conducted on December 4, 2008, was "essentially normal."  (Tr. 223).

At a January 14, 2009 appointment, Faust's mother reported that he had had behavior problems for two years and was diagnosed with bipolar disorder in December.  (Tr. 218).  He had been seeing another doctor and a counselor, which he and his mother had not found helpful.  His mother reported that his current problem was insomnia.  (*Id.*).  He also had thoughts of hurting himself but no plan.  (*Id.*).  She reported that he also used to argue and throw things, but since being on Depakote he now just argues.  (*Id.*).  When alone with the doctor, Faust mentioned having friends at school.  (*Id.*)  He also admitted that he had started taking Vicodin a few months earlier.  (*Id.*).  Though the Vicodin made him feel better, he said he was not currently taking it.  (*Id.*).  Upon examination, Faust was noted to have poor eye contact and be poorly groomed.  (*Id.*).  He answered all of the doctor's questions, and was reported to have insight and want help.  (*Id.*).  He was diagnosed with bipolar disorder and it was noted he was currently prescribed Prozac and Depakote.  (*Id.*).  For his insomnia, the doctor prescribed Trazodone.

At a January 29, 2009 appointment, Faust's mother reported that he had been sleeping better since starting Trazodone, but that it was making him drowsy during the day and he wanted a different medication.  (Tr. 217).  He denied suicidal ideation and his appetite was improving.  (*Id.*).  Upon examination it was noted he was more communicative and less drowsy compared to

his last visit.  (*Id.*).  He was better groomed and able to answer more questions.  (*Id.*).  He was assessed with moderate to marked depression and his medications were continued.  (Tr. 216).

At an appointment on December 29, 2009, Faust reported that his depression was much better and that he had no other issues.  (Tr. 235).  He reported no suicidal ideation, and that he had "a lot of friends."  (Tr. 234).  He also reported contemplating going to college.  (*Id.*).  He and his mother "wonder if they can stop[] seeing the psychologist as he says that he does not benefit much from sessions and that she is quite 'overbearing.'"  (Tr. 233).  The doctor recommended that Faust continue with both his psychiatrist and the psychologist "as improvements may be from both."  (Tr. 234).

At a July 19, 2010 appointment, Faust sought medication refills, but reported that he felt they were not working.  (Tr. 328).  He reported feeling depressed, getting angry and frustrated and that he could not sleep well.  (*Id.*).  He also reported impatience with personal interactions and an occasional desire to hurt himself.  (*Id.*).  His mother reported that the Depakote "is helping some."  (*Id.*).  Upon examination, Faust was noted to have good eye contact, a somewhat depressed affect, and normal behavior and speech.  (*Id.*).  The doctor increased Faust's dosage of Abilify and recommended that he follow up with his psychiatrist.  (*Id.*).

At an August 17, 2010 appointment, Faust reported "some improvement in mood," with no suicidal or homicidal thoughts, but also experienced "some fatigue."  (Tr. 326-27).  Upon examination, he was "[n]egative for depression, suicidal ideals, hallucinations and substance abuse.  The patient is not nervous/anxious and does not have insomnia."  (Tr. 326).  He had a flat affect, good eye contact and slowing psychomotor agitation.  (*Id.*).  He was assessed with a "[m]ood disorder with good preliminary response to med[ication] adjustment."  (*Id.*).  The doctor recommended starting Wellbutrin for smoking cessation and keeping the other medications the

same for now.  (*Id.*).  At an appointment on September 16, 2010, Faust reported his suicidal tendencies had improved with the increased Abilify dosage, but that his Wellbutrin had interfered with his sleep and caused him more suicidal thoughts and more depression, so he had stopped taking it.  (Tr. 324-25).  Upon examination, Faust was noted to appear depressed, and have a flat affect and poor eye contact.  (Tr. 324).  The doctor increased his Abilify dosage and recommended he see a psychiatrist in addition to his counselor.  (*Id.*).

At a September 30, 2010 appointment, Faust noted that he experienced seizure-like episodes on the increased Abilify dosage, so he reduced it on his own and the seizures stopped. (Tr. 322-23).  He continued to report depression, although he saw improved mood symptoms. (*Id.*).  He also reported homicidal ideation but no intent, and no suicidal thoughts.  (*Id.*).  Upon examination he was found to have good eye contact, congruent mood, normal affect and speech, with occasional smiling and appropriate answers.  (*Id.*).  At an October 27, 2010 appointment, Faust reported "feeling good for the last couple of days, full of energy and engaging himself in new projects."  (Tr. 320).  He did not feel like sleeping as much as he did before, and his appetite was "ok."  (*Id.*).  Upon examination, he was positive for memory loss, but negative for suicidal ideas, hallucinations and substance abuse.  (Tr. 320-21).  He was not nervous or anxious and did not have insomnia.  (Tr. 321).  His judgment, thought content and speech were normal; he had good eye contact, appropriate responses, normal dress and no tangential thought.  (*Id.*).  He was determined to have "hypomanic symptoms" and his current medication regimen was continued. (*Id.*).

At a November 19, 2010 appointment, Faust reported being started on Klonopin by his psychiatrist for social phobia, and that his mood was "on/off."  (Tr. 319).  Upon examination, the doctor noted that Faust's mood was congruent, his behavior normal and affect good.  (*Id.*).  He

had good eye contact and gave appropriate answers to questions.  (*Id.*).  His medications were continued.  (*Id.*).  At a December 29, 2010 appointment, Faust reported not feeling any change in daily symptoms but feeling "really good" for the past three days.  (Tr. 318).  He reported energy, no anxiety around people, good sleep and that he was losing weight.  (*Id.*).  He reported planning to apply for college and that he had "[n]ever felt like this before."  (*Id.*).  Upon examination he was noted to have a normal mood, affect and behavior.  (*Id.*).  His medications were continued as prescribed by the psychiatrist.  (*Id.*).

*ii.*      *Dr. Arvind Kumar*

Faust underwent a psychiatric assessment by Dr. Arvind Kumar of the Westlund Child Guidance Clinic on December 1, 2008, at the request of Faust's counselor.  (Tr. 230-31).  He reported being a gifted child who had fallen behind in school and had difficulty sustaining sleep.  (Tr. 230).  He was depressed most of the time and had mood swings.  (*Id.*).  He sought immediate gratification, was easily angered and irritable, and went on spending sprees.  (*Id.*).  He was recently suspended from school for slapping someone, and had no motivation to do anything.  (*Id.*).  He denied paranoia or hearing voices.  (*Id.*).  He reported headaches and that his right hand shook when he was angry.  (*Id.*).  Upon examination his grooming and hygiene were found to be borderline fair.  (Tr. 231).  He had no signs of psychomotor agitation.  (*Id.*).  He also had fair eye contact, coherent and relevant speech, and no flight of ideas or evidence of thought disorder.  (*Id.*).  His affect was blunted, and his mood somewhat sad and anxious.  (*Id.*).  He denied suicidal or homicidal thoughts, delusions or hallucinations.  (*Id.*).  He was oriented times three.  (*Id.*).  Dr. Kumar diagnosed Faust with bipolar mood disorder and assessed him a Global Assessment of Functioning score of 55.  (*Id.*).  Dr. Kumar prescribed Depakote and Prozac and a course of counseling.  (*Id.*).

11

At a follow-up appointment on December 29, 2008, Faust reported continued mood swings, but that he was sleeping better. (Tr. 229). He was not taking his full dose of Depakote. (*Id.*). Upon examination, it was noted that Faust was dressed appropriately, his grooming and hygiene were fair, and he had mild signs of psychomotor agitation. (*Id.*). He had no suicidal or homicidal thoughts and no overt psychosis. (*Id.*). His mood was euthymic and his speech was clear and coherent. (*Id.*). His memory and cognition were intact. (*Id.*). He reported no medication side effects. (*Id.*). Dr. Kumar continued his medications and also prescribed Ambien. (*Id.*). At a follow-up on January 29, 2009, Faust reported feeling better on his medication, despite the fact that he was only taking half the prescribed dosage. (Tr. 228). His mood swings were better. (*Id.*). Upon examination it was noted that Faust's affect was brighter, his speech clear and coherent, his mood euthymic and his memory and cognition intact. (*Id.*). He had no suicidal or homicidal thoughts and no complaints of side effects. (*Id.*). His medications were continued. (*Id.*).

At a follow-up on February 28, 2009, Faust reported doing better and sleeping well, although he still had mood swings. (Tr. 227). He did not report suicidal or homicidal thoughts, nor did he report any side effects of his medication. (*Id.*). Upon examination, Faust's affect was noted to be brighter, his speech clear and coherent, his mood euthymic, his memory and cognition intact. (*Id.*). Dr. Kumar increased his Depakote dosage. (*Id.*). At a follow-up on March 25, 2009, Faust's mother reported that his medication worked for a while "then he's in the same boat." (Tr. 226). She reported that he had no motivation to do anything and that she had to "push him to get out of bed to go to work." (*Id.*). Upon examination, Dr. Kumar noted that Faust had "low self-esteem with feelings of helplessness." (*Id.*). He had no suicidal or homicidal thoughts, no overt psychosis and no medication side effects. (*Id.*). His affect was

12

blunted, his mood somewhat sad or anxious.  (*Id.*).  However his speech was clear and coherent, his talk logical and goal directed, and his memory and cognition intact.  (*Id.*).  Dr. Kumar continued his medications.  (*Id.*).

### iii.   Saginaw Psychological Services

On May 12, 2010, Faust was evaluated by Victor Jurkowski, a limited license psychological counselor at Saginaw Psychological Services.  Faust reported a prior diagnosis of bipolar disorder and that he was uncomfortable around people due to paranoid thoughts and thoughts about hurting them.  (Tr. 272).  He had no specific person as the subject of his violent thoughts.  (*Id.*).  He also believed others could see into his mind.  (*Id.*).  He reported being on medication but that it was not helping like it had at first.  (*Id.*).  He recognized his own addictive and obsessive personality traits and sought to avoid their triggers.  (Tr. 350).  He also reported a voice in his head, but acknowledged it was his own, narrating in third person.  (*Id.*).  Upon examination, Faust was found to be oriented to person, place and time.  (Tr. 270).  He was expressive, articulate, and motivated for change, but also distrustful and constantly questioning himself.  (*Id.*).  He had a positive support network and was physically healthy.  (*Id.*).  His mood was anxious, his attitude guarded and suspicious.  (*Id.*).  His affect was constricted, his speech pressured and his motor activity restless.  (*Id.*).  His immediate and remote memory were both found to be partially impaired and his judgment was impulsive and minimally impaired.  (*Id.*).  His insight was intact and his intelligence average.  (*Id.*).  His thought process was a flight of ideas and blocked.  (Tr. 271).  He also had persecutory delusions.  (*Id.*).

Faust was determined to have a slight risk of suicide, self-harm, or child, elder or partner abuse, and a moderate risk of violence.  (*Id.*).  He was diagnosed with Bipolar I, with seasonal pattern, and issued a GAF score of 53.  (Tr. 272).  Faust attended counseling sessions with

Jurkowski from May until December 2010.  (Tr. 281-89).  At almost all of the appointments, Jurkowski noted that Faust's response to intervention had been positive, and his motivation and rapport had been low to medium.  (Tr. 281-82; 287; 289; 370-77).  However, Jurkowski noted little to moderate change in Faust during this time.  (*Id.*).  In notes from an appointment on November 2, 2010, Jurkowski noted that Faust was making "slow progress" and that his medication management was being switched from his primary care physician to a psychiatrist.  (Tr. 365).  In notes from a missed appointment on December 21, 2010, it was noted that Faust was having trouble with insurance coverage for counseling, but also that he felt "happy" with his current medications and had "no desire to continue counseling."  (Tr. 370).

Faust was seen for a psychiatric evaluation on October 29, 2010, by Dr. C.A.N. Rao.  (Tr. 337-38).  Faust reported feeling moody and irritable and having trouble sleeping.  (Tr. 337).  He also had problems with confusion and paranoia.  (*Id.*).  He denied suicidal or homicidal ideations.  (*Id.*).  Upon examination, Dr. Rao noted that Faust's thought process was "grossly logical," and that he denied any acute psychotic symptoms.  (Tr. 338).  He was diagnosed with atypical bipolar disorder and issued a GAF score of 65.  (*Id.*).  Dr. Rao continued Faust's Depakote and Abilify and added Klonopin to help with anxiety and tension.  (*Id.*).  At a follow-up on November 19, 2010, Faust reported that he was still feeling down and had no energy.  (Tr. 336).  He also reported that his Depakote was making him sleepy.  (*Id.*).  Dr. Rao recommended taking one in the morning and one at night to help with this problem.  (*Id.*).  He also discontinued Abilify and added Zoloft.  (*Id.*).

At a December 17, 2010 appointment, Faust reported "doing somewhat better with the medications."  (Tr. 335).  He reported a better appetite, weight loss, improved sleep and no anxiety.  (*Id.*).  He felt that "the medications are helpful."  (*Id.*).  The doctor continued his

14

medications.  (*Id.*).  At a January 14, 2011 appointment, Faust reported that he was "still feeling down and I still don't feel like working."  (Tr. 334).  He reported feeling bored, hopeless and helpless.  (*Id.*).  His thought process was logical and relevant.  (*Id.*).  His mother reported that he was unable to see his counselor due to insurance troubles.  (*Id.*).  The doctor recommended speaking to the counselor as to why he could not be seen since "he needs it."  (*Id.*).  His medications were continued.  (*Id.*).

*iv.*     *White Pine Hospital*

Faust was voluntarily admitted to White Pine Psychiatric Hospital on January 19, 2011, and stayed there for six days before voluntarily terminating his stay.  (Tr. 399-400).  Upon admission, Faust stated that he was having suicidal and homicidal ideations.  (Tr. 399).  He was tired, had a poor appetite and had lost 20 pounds.  (*Id.*).  He had anxiety in public, slept up to 16 hours a day and had auditory hallucinations involving two entities, one of which told him to torture people.  (*Id.*).  He reported forgetfulness and difficulty controlling his temper.  (*Id.*).  He also reported a history of breaking things and pushing his mother, as well as a history of anxiety and panic attacks.  (*Id.*).  He reported that he took medications for his condition, but that they did not help, nor did they cause any side effects.  (*Id.*).

"On admission [Faust was found to be] well-developed, well-nourished … [and] in no acute distress."  (Tr. 400).  Upon examination, it was noted that Faust's grooming was fair, his affect was congruent, and there was no psychomotor retardation.  (*Id.*).  His eye contact was fair, his thoughts clear and linear and he did not appear to be responding to internal stimuli.  (*Id.*).  He was diagnosed with bipolar I disorder, severe with psychotic features, and social anxiety disorder.  His was assessed a GAF score of 15.  (*Id.*).

Upon discharge, he continued to be diagnosed with the same conditions, but his GAF

15

score had improved to 40.  (*Id.*).  The doctor noted that during his stay, Faust had participated in group therapy and had interacted well with others.  (*Id.*).  His mood and affect had improved, and at discharge Faust reported his mood as "good."  (*Id.*).  He had decreased auditory hallucinations and no command hallucinations.  (*Id.*).  He denied visual hallucinations.  (*Id.*).  He denied suicidal, homicidal or assaultive ideation, and he was eating and sleeping well.  (*Id.*).  He denied medication side effects.  (*Id.*).  His mood was euthymic, his thoughts logical and that he was not overly psychotic or manicky.  (*Id.*).  The doctor found him ready for discharge.  (*Id.*).

### v.    *Janes Street Clinic*

Faust underwent a psychosocial assessment at the Janes Street Clinic on April 19, 2011. (Tr. 389-92).  His symptoms included depression, confusion, poor concentration, impulsivity, anxiety, sadness, delusions, anger, withdrawal, phobia, agitation, fatigue, paranoia and racing thoughts.  (Tr. 389).  He was also found to be manic and argumentative, with hallucinations, delusions, and suicidal and homicidal thoughts.  (*Id.*).  He referred to voices in his head but noted that he never followed through with what they said.  (*Id.*).

Upon examination, Faust was oriented times three.  (*Id.*).  His appearance was inappropriate and his hygiene noted.  (*Id.*).  His eye contact fluctuated and rapport was found to be fair or poor.  (*Id.*).  His mood was depressed and labile, his behavior hypoactive and restless, but his intelligence above average.  (*Id.*).  His thinking was obsessive and his judgment and memory were impaired.  (*Id.*).  However, he had good insight into his problems.  (*Id.*).  His symptoms were found to significantly or severely interfere with his functioning.  (Tr. 390).  He had a moderate risk of harm to himself and others and he reported a history of emotional and verbal abuse from his mother.  (*Id.*).  He was diagnosed with bipolar disorder with psychotic features and rule out dissociative identity disorder.  (Tr. 392).  He was assessed a GAF score of

50. (*Id.*). He was referred for outpatient treatment and a psychiatric assessment. (*Id.*).

        *b.     Consultative and Non-Examining Sources*

On April 2, 2009, Faust was evaluated by Dr. Nathalie Menendes for the State of Michigan. Faust reported being diagnosed with bipolar disorder the previous fall and that he felt depressed and irritable most of the time. (Tr. 258). He suffered from crying spells and low motivation. (*Id.*). He reported anxiety in public, which caused paranoia, and problems sleeping, which caused him to be tired during the day. (*Id.*). He also reported a decreased appetite. (*Id.*). Faust reported few friends, and that he had suicidal ideations and had once attempted suicide. (*Id.*). He had manic episodes every few weeks where he acted on impulsive thoughts and then regretted it later. (*Id.*). He reported working 14 hours a week and feeling that he could work a little more, but not full time, due to his symptoms. (*Id.*). He reported no hospital treatment. (*Id.*).

Faust reported living in his mother's finished basement apartment and getting along with her except that they argue. (*Id.*). He reported a few good friends, no significant other, and a good relationship with his grandmother. (*Id.*). He enjoyed painting and playing guitar and used to enjoy playing video games but has lost interest in that. (*Id.*). He usually went to bed around 1 a.m. and got up at 5 a.m.. (*Id.*). He washed his laundry and cleaned the bathroom. (*Id.*). He rarely ate meals and normally just snacked. (*Id.*).

Upon examination, Faust's appearance was clean and casual, and his hygiene adequate. (*Id.*). He was cooperative and polite but seemed sluggish with little energy. (*Id.*). His contact with reality was good, insight fair, and self-esteem poor. (*Id.*). His motivation was low and he seemed to depend on his mother "a lot." (*Id.*). His thoughts were spontaneous, logical and

organized, and he appeared "rather bright." (*Id.*). There was no evidence of hallucinations, delusions, or persecutions noted during the interview. (Tr. 260). He reported feeling "indifferent" and his affect was tired. (*Id.*). He could repeat 8 numbers forward and 5 backward, but could not remember any of three objects after three minutes. (*Id.*). He could name the past few presidents, five large cities, famous people and current events, and could accurately complete simple calculations and serial backwards counting. (*Id.*). He was able to think abstractly, make accurate comparisons between objects and make some appropriate judgments but not others. (*Id.*). Dr. Menendes summarized her findings as follows:

> Based on today's exam, the claimant is able to understand, retain, and follow simple and one step instructions. He is able to perform and remember simple, routine, and repetitive tangible tasks . . . Further, he does not handle frustrating situations well and should not be expected to be able to cope with stress or difficult situations in the work setting. His social skills are fair but he would not be able to deal well with conflict.

(Tr. 261). Dr. Menendes diagnosed Faust with bipolar I disorder and anxiety disorder not otherwise specified. (*Id.*). She issued him a GAF score of 42 and a guarded prognosis. (*Id.*).

On August 18, 2010, Dr. Judy Strait completed a disability determination explanation for Faust. (Tr. 296-305). In it, she evaluated all of the record evidence to date, and determined that Faust's allegations of disability were only partly credible. (Tr. 301). She concluded that he suffered from an affective disorder resulting in mild restrictions of activities of daily living, and moderate difficulties in social functioning and concentration, persistence and pace. (Tr. 300). She found no episodes of decompensation. (*Id.*). She found that he was moderately limited in the following areas: (1) his ability to understand, remember and carry out detailed instructions; (2) his ability to maintain attention and concentration for extended periods of time; (3) his ability to work in coordination with or in proximity to others without being distracted by them; (4) his ability to complete a normal workday and workweek without interruption from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) his ability to interact appropriately with the general public; (6) his ability to accept instructions and respond appropriately to criticism from supervisors; (7) his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) his ability to respond appropriately to changes in the work setting; (9) his ability to travel in unfamiliar places or use public transportation; and (10) his ability to set realistic goals or make plans independently of others.  (Tr. 302-303).  Despite those limitations, however, she found that Faust retained "the capacity to perform simple, routine tasks on a sustained basis."  (Tr. 303). She concluded that he was limited to unskilled work and that his non-exertional limitations did not significantly erode the occupational base.  (Tr. 304).

### 4.    Vocational Expert's Testimony

VE Anne Trimley testified that Faust's past work was classified as light exertion and semi-skilled.  (Tr. 59).  The ALJ then asked the VE to imagine a hypothetical person of Faust's age, educational level, and vocational background who had no exertional limitations and who:

> retains the mental capacity to perform simple, routine, competitive tasks; he can occasionally interact with coworker[s] and engage in occasional, non-confrontational interaction with supervisors; he should never interact with the general public; he would work best in relative isolation or in a small familiar group; [and] he can adjust to only minimal to occasional changes in a routine work setting.

(Tr. 59-60).  The ALJ then asked the VE whether such an individual could perform Faust's past work.  (Tr. 60).  The VE testified that he could not.  (Id.).  The ALJ then asked if there were other occupations that the person could perform.  (Id.).  The VE testified that such a person could perform the jobs of dishwasher (4,200 jobs in the state of Michigan), laundry worker (2,400 jobs), and cleaner (35,000 jobs).  (Id.).  The ALJ then asked if she added to the hypothetical the need for at least four unscheduled breaks per day lasting at least 10 minutes apiece, would this

change the VE's response.  (*Id.*).  The VE testified that such a limitation would preclude work.

(Tr. 61).

## C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if
> other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ determined that Faust was not disabled. At Step One she determined that Faust had not engaged in substantial gainful activity since his alleged onset date, as his part-time work did not rise to the level of "substantial gainful activity" as that term is defined in the Act. (Tr. 13). At Step Two she found the following severe impairments: "bipolar disorder and social anxiety disorder." (*Id.*). At Step Three she concluded that none of Faust's impairments, either alone or in combination, met or medically equaled a listed impairment. (Tr. 14). In making this determination, the ALJ found that Faust had mild restrictions in activities of daily living, marked difficulties in social functioning, moderate difficulties in maintaining concentration, persistence and pace, and one episode of decompensation. (Tr. 14-15). She then assessed Faust's RFC, finding him capable of:

> a full range of work at all exertional levels but with the following nonexertional limitations: He retains the mental capacity to perform simple, routine, repetitive tasks. The claimant can occasionally interact with coworkers and engage in occasional nonconfrontational interaction with supervisors. He should never interact with the general public. The claimant would work best in relative isolation or in a small familiar group. He can adjust to only minimal to occasional changes in a routine work setting.

(Tr. 15). At Step Four she found that, based on this RFC, Faust was not capable of returning to his past work. (Tr. 19). At Step Five she concluded that, based on his age, education, vocational background and RFC, there were a significant number of other jobs in the national economy that he could still perform, and thus he was not disabled. (Tr. 19-20).

E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

22

& *Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Faust argues that the ALJ's decision is not supported by substantial evidence for two reasons. First he argues that the ALJ erred in not finding that he satisfied either Listing 12.04 "Affective Disorders" or 12.06 "Anxiety-Related Disorders" because the evidence of record demonstrates that he did in fact meet the "paragraph B" criteria necessary to satisfy the requirements of those listings. He further argues that the ALJ's hypothetical did not account for all of his credible limitations, and that a complete hypothetical would have resulted in the acceptance of the VE's testimony that his limitations precluded all competitive employment. The court takes each argument in turn.

#### 1.    Listing 12.04 and 12.06

First, Faust argues that the ALJ erred in only finding a mild restriction in his activities of daily living, a moderate restriction in his ability to maintain concentration, persistence and pace and only one episode of decompensation. He argues that the evidence of record supports a finding of a "marked" limitation in all four categories, which would result in his conditions

meeting or medically equaling both Listing 12.04 and 12.06.  The court disagrees.

In order to satisfy either Listing 12.04 or 12.06, a claimant must satisfy requirements in both paragraphs A and B of each listing, or alternatively in paragraph C of each listing.  To satisfy the "paragraph B" criteria for either listing, the claimant's mental impairments must result in at least two of the following:  marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence and pace; or repeated episodes of decompensation, each of extended duration.  *See* Listing 12.04(B) and 12.06(B).

Here, in the area of activities of daily living, the ALJ found only mild limitations, based on Faust's and his mother's reports that he was assigned and did do chores around the house, including mowing the lawn, taking out the trash and cleaning his room.  (Tr. 14).  With regard to his ability to maintain social functioning, the ALJ found marked limitations, based on the fact that Faust's friends only came to see him, and that, although he goes to trading card games, he sometimes comes home early due to paranoia.  (*Id.*).  With regard to his ability to maintain concentration, persistence and pace, the ALJ found moderate difficulties, based on the fact that Faust reports playing trading card games once a week and using the internet daily.  (*Id.*).  The ALJ then found one episode of decompensation, based on Faust's 2011 psychiatric hospitalization.  (*Id.*).

Faust does not argue exactly what facts of his case should have resulted in more severe limitations than what the ALJ found.  Rather, Faust argues that the ALJ should have found marked limitations in each of the above categories, and *repeated* episodes of decompensation because, he claims, the facts of his case are similar to the facts of the Sixth Circuit case of *Lankford v. Sullivan*, 942 F.2d 301 (6th Cir. 1991).  In *Lankford*, the claimant had repeatedly

24

been arrested for violent outbursts against his wife, other family members and other individuals. *Id.* at 303-304. He had engaged in violent behavior in seemingly innocuous situations, such as lashing out at a hospital worker when his wife could not be reached, and shooting the phone off the wall with a gun over his Social Security hearing. *Id.* at 304-305. He also repeatedly threatened to kill himself and was hospitalized multiple times for apparent suicidal ideation and attempts. *Id.* at 308. Overall, the claimant in *Lankford* was hospitalized "a total of sixty-six days in 1975, seventy-four days in 1976, fifty-two days in 1977 and sixty-four days in 1978." *Id.* The Sixth Circuit, using a prior version of the "paragraph B" criteria, found that the district court erred in upholding the ALJ's finding of "not disabled" because the claimant did satisfy a sufficient number of "paragraph B" criteria to meet or medically equal a listed impairment. *Id.* at 307-309. Specifically, the court noted that the claimant deteriorated not only in work situations, as he had been fired from multiple jobs due to his symptoms, but also in mildly stressful situations. *Id.* at 307-308. The court also noted Lankford's multiple and extended hospitalizations, his complete inability to get along with others, and his use of violence to control situations. *Id.* The court found that all of these things combined resulted in marked limitations in his activities of daily living, marked limitations in social functioning, and repeated episodes of deterioration or decompensation in work or work-like settings. *Id.* at 309. Thus, the claimant qualified for a listed impairment. *Id.*

While Faust's symptoms clearly create challenges for him, they are not as severe as those of the claimant in *Lankford*, making that case distinguishable from this one. For instance, whereas Lankford had multiple lengthy hospitalizations, the records here show that Faust was hospitalized on one occasion for less than a week. *Supra* at 15-16. And, although any hospitalization is a serious matter, Faust's medical records show that he interacted well with

25

others in group therapy while there, and had clear thoughts. (Tr. 18). Faust's ability to engage in various activities is another distinguishing feature. As the ALJ pointed out, Faust is capable of performing a number of normal daily activities including chores around the house. (Tr. 14). He also is capable of playing a trading card game (both with others and online) that requires a certain level of sustained concentration. (*Id.*). Faust himself reported that while some evenings he may leave tournaments early, at other times he may spend three hours there. (Tr. 165). He also reported that he enjoyed spending time at his computer, and his mother reported that on some days he would "hibernate" there. (Tr. 42, 140). Faust is also different from Lankford because whereas Lankford resorted to actual violence, there are few indications that Faust ever carried violence out against others, and any physical altercations that did occur were not severe. (Tr. 144; 218; 230; 271; 399; 403).

Nevertheless, the ALJ found that Faust had marked restrictions in social functioning, which takes into account his inability to interact appropriately with others. (Tr. 14). Thus, at least on that element of the Listings, there can be no reversible error.

Faust appears to base his arguments solely on subjective reports and testimony, which the ALJ found less than fully credible. (Tr. 18-19). The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Faust identifies no such compelling reason why the ALJ's credibility finding is not valid. He does not point to specific evidence in the medical record supporting his arguments or his testimony. Nor could he, as no physician, treating or otherwise, placed greater limitations on him than what the ALJ concluded were appropriate. In fact, the

26

ALJ found more severe limitations than what the consulting examiner found; while the consulting examiner found only moderate restrictions in social functioning, the ALJ concluded that Faust suffered from marked restrictions in that area. (Tr. 18).

Finally, Faust does not explain why he should have been found to have suffered from more than one episode of decompensation.  Episodes of decompensation are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. § 404, Subpt. P, App. 1 § 12.00C(4).  These episodes "would ordinarily require increased treatment or a less stressful situation (or a combination of the two)," and may be evidenced by "medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system."  *Id.*  As the Commissioner points out, the regulatory definition of "repeated episodes of decompensation" generally requires "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  *Id.*  The regulations go on to say that, "If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."  *Id.*  Faust notes only his and his mother's reports, and his testimony that he needed to take a number of breaks during the work day to remove himself from stressful situations around others, but he does not argue or offer any support showing that the combination of these breaks rise to the level of "repeated episodes of decompensation" as defined above.  For these reasons, Faust's argument, that the evidence supports his condition meeting or medically equaling a listed impairment, is without merit.

27

2.    *Adequacy of the RFC Assessment*

Faust argues that the ALJ erred in failing to include in her RFC assessment his claimed need to take multiple unscheduled breaks during the day due to his anxiety and panic attacks. When this limitation was posed to the VE during the hearing, she testified that such a limitation would preclude all work. (Tr. 61). However, contrary to Faust's argument, the ALJ adequately accounted for this limitation in her RFC, imposing limitations that were based on Faust's own subjective reporting and testimony, and which were consistent with the medical evidence.

In the hearing, Faust specifically noted the circumstances that required him to take these breaks, and that they occurred when he became paranoid, anxious or overwhelmed when interacting with customers. (Tr. 36-39; 47-52). He also testified that he enjoyed playing games on his computer because it meant that he did not have to interact with people. (Tr. 42). Based on this testimony, the ALJ incorporated into her RFC a number of restrictions, supported by substantial evidence[1], which would result in working conditions preventing the need for such breaks, namely that Faust would "never interact with the general public," and that he would only

---

[1] For instance, the ALJ cited Dr. Menendes' findings that Faust "had good contact with reality and [fair] insight [and that Faust] retains the ability to understand, retain and follow simple and one-step instructions and has no intellectual limitations." (Tr. 17). The ALJ was entitled to credit this type of evidence over the GAF score that Menedes assessed. (*Id.*). The ALJ cited treatment records from late 2010 and early 2011 which showed that Faust was doing well, was engaging in new projects, was "full of energy," and was planning to enroll in college. (*Id.*). Although Faust was briefly hospitalized on January 19, 2011, the ALJ noted that even during that hospitalization, he was not in distress, and had clear thoughts and a congruent affect. (Tr. 18). The ALJ also noted that Faust "interacted well with others in group therapy" in the hospital, and that his mood and affect improved over a short period of time prior to his discharge. (*Id.*). The ALJ also noted that in October 2010, Faust's treating psychiatrist, Dr. C.A.N. Rao, gave him a GAF score of 65, which "indicates some *mild* symptoms or some difficulty in social, occupational, or school functioning, but *generally functioning pretty well* and with some meaningful interpersonal relationships. (Tr. 18) (emphasis in original). She noted, and gave great weight to, the Disability Determination Services' mental health professional's finding that Faust "has the mental residual capacity to perform simple, uncomplicated jobs that [he] can lean in a short time. (*Id.*). Faust cites no medical source opinions that his limitations were greater than the ones imposed by the ALJ.

"occasionally interact with coworkers and engage in occasional nonconfrontational interaction with supervisors." (Tr. 15). She further found that Faust would "work best in relative isolation or in a small familiar group." (Tr. 15). These limitations sufficiently account for Faust's interpersonal paranoia and anxiety, (which, by his own testimony are the causes of his repeated panic attacks and breaks at work), and as such, there was no need for her to incorporate a requirement for multiple unscheduled breaks into her RFC assessment.

In sum, the ALJ's RFC assessment, and her ultimate conclusion, are supported by substantial evidence of record and should be upheld.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Faust's Motion for Summary Judgment **[11]** be **DENIED**, the Commissioner's Motion **[15]** be **GRANTED** and this case be **AFFIRMED**.

Dated: October 10, 2012                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 10, 2012.

s/Felicia M. Moses        
FELICIA M. MOSES
Case Manager
